THE prisoner was tried in June 1851, for the murder of his wife. He was an aged man of position and property, in Sussex county, shrewd and successful in business, of general good character and peaceful conduct; but the subject of melancholy habits and hypocondriac affections; of superstitious fears and vague apprehensions; probably, of fixed delusions on certain subjects. He was affectionate, and, in general, kind to his wife, who was much younger than he, and parentally fond of her children; except when under the influence of these delusions, which induced a belief of her infidelity, and of her practising spells upon him, in conjunction with others, to take his life. During these paroxisms of jealousy, suspicion and fear, he exhibited great violence of temper; and, in one of them, deliberately shot his wife with a pistol.
The defence was insanity; and he was ably defended by Messrs.Robinson, Bayard, Houston and David Paul Brown. Mr. Cullen aided theAttorney General in the prosecution. The trial occupied eight days. From the prisoner's respectable condition and connexions, the character of the crime and other circumstances, it excited as much interest as any case ever tried in this county.
A motion was made to quash the array of jurors for defect of *Page 513 
summons; and also to change the venue, founded on affidavits of counsel, that from extensive inquiry and conversation, they were satisfied there was such a deep and wide spread excitement through the community on the subject of this outrage, as to amount to a settled prejudiced sentiment against the prisoner, and that they were fully of opinion that he could not, on the defence of insanity on one subject, have a fair and impartial trial in Sussex county. The affidavits, also, stated that, chiefly, as they believed, because of this prejudice, they could not procure other persons to make affidavit to this effect, though such persons admitted in conversation that such was their belief.
The Court directed the prisoner to be arraigned before hearing these motions, and he pleaded "not guilty."
A rule was then laid to show cause why a suggestion should not be entered on the record, changing the venue to Kent county; and, after full argument, this rule was discharged, on the ground that the affidavits were of opinions merely and did not state any facts, nor were such other facts otherwise proved, upon which the court could determine that an impartial trial could not be had in this county. They referred to State vs. Burris, 4 Harr. Rep., 582.
On the other motion, the court quashed the array, on the ground that the jurors attending the Court of General Sessions, which the law makes a part of the jury of this court, had not been summoned to attend this court; but they affirmed their power under the act of 1849, to order the drawing and summoning jurors forthwith; but would always exercise such discretion in reference to the case in hand, and in a capital case, where the prisoner is entitled to a copy of the panel and time to prepare for his challenges, they would take care to allow proper time for such purpose.
They ordered a new jury to be drawn and summoned for Wednesday, the 25th instant.
On that day the prisoner was brought to the bar and put upon his trial.
The Attorney General asked the court to say to the jurors generally, if they had conscientious scruples in regard to sitting in a capital case, they ought to make it known; and the court said so.
The prisoner's counsel asked to swear each juror on the voire dire, that he might be asked if he had formed and expressed, or formed an opinion in the case.
Mr. Cullen objected, that it was not proper for a juror to disqualify *Page 514 
himself. He cited to show this, 6 Com. Law Rep., 576; 1 Ch. Cr. L., 371, 542.
The Court said the practice in this State was settled by repeated decisions, contrary to the English practice, that a juror might be asked on the voire dire if he had formed and expressed, or even formed an opinion of the guilt or innocence of the prisoner; and they saw no reason why he should not equally be asked, upon his oath as to his conscientious scruples. If the juror have formed and expressed an opinion as to the prisoner's guilt, it has been held a cause of challenge; but it ought to be the unqualified expression of an opinion on the point of guilt, and not a general impression merely. If the juror have merely formed an opinion, he may be examined as to the bias which such opinion has made on his mind, and if he be not sensible of any prejudice which would be likely to influence his judgment, he must be sworn in chief.
A jury was obtained after sixty-four challenges allowed for cause, and fifteen peremptory.
A great many witnesses were examined to prove the existence and force of insane delusions throughout the prisoner's life; derived, perhaps, by inheritance. A great many acts were proved, from which insanity might be inferred; and the positive opinions of expert physicians, founded on this proof, and on personal examination of the prisoner, were added.
The State, on the other hand, relied on the general good sense and shrewdness in business which the prisoner was known to possess, and through which he had acquired considerable property; on the general opinion of those who knew him, including medical men, with regard to his sanity; and on many facts which were supposed to show deliberation; design and contrivance in the act of killing, and malice as the motive. The case is entirely too long for a report of the testimony in detail; but a portion of the testimony will show the facts connected with the homicide, and present the grounds of defence.
James Stuart. — On Thursday morning, May 2, 18, 50, about 7 o'clock, I heard that Captain Windsor had shot his wife. I ran over to his house and saw him standing in the yard with a gun in his hand; he was pointing it at a man who was passing. He said where is the d — d son of a b — h? I said Captain, what's the matter? He said, I have shot my wife; go up stairs and' see her, if you choose. I went up and saw her lying on the floor, very pale; *Page 515 
a child eighteen months' old sitting by her crying. I spoke to her and she opened her eyes with an expression of gladness; begged me to carry her down stairs, as she should die in a few minutes, and said that her husband had shot her. She said she was in the loom weaving for him, and he came into the room, presented a pistol and told her she had but a short time to live, that he was going to shoot her, that she fled and got where she then was, and he shot her. I went down stairs, found the prisoner in his store; he refused to let me come in; I pushed the door open and found him standing with the gun in his hands; I demanded the gun and he refused to give it up; I took hold of it, to take it away, when I smelt laudanum, and said to him "you old dog, you are not satisfied to kill one, but have been killing yourself!" He suffered me to take the gun and asked me not to shoot him. He said he had taken a half a gill of laudanum and would, soon be dead; that he had intended to kill Joseph Osborne, then his wife, and Alexander Ellegood and Milford Saunders, (negro,) if they interfered with him. He told me a long story of his grievances; mentioned this letter; asked me to correct the spelling and grammar, (without altering the sense,) and to have it published at his expense; told me to go to the desk and get money to pay for the publication; he handed me the key and gave me also a list of judgments. The laudanum soon began to operate on him; but before this he told me he did shoot her, and shot to kill. Before she died she sent for him and he went up to her. She desired to be lifted in her bed, and said to him, "take care of the children; you have said they were not yours; I have but a few minutes to live; before God and on my dying bed they are yours, and I want you to do a father's part by them." She called him to look at her wound, and he began to cry, and said he would not have done it for a thousand worlds, and then left the room.
In the course of the day, the prisoner said he had intended this for some time; he gave as the reason for taking the laudanum, that he didn't mean to be hung; that he would not be made a public example. He walked about violently, until he became weak, and sat down, and then fell. He asked me for more laudanum. I said I had a small quantity at home; enough to fix him off. He begged Dr. Fisher for poison. Mrs. Windsor died about 3 o'clock that afternoon.
The letter referred to is as follows: —
"I have set down in great distress, both in body and mind, to *Page 516 
think I married a woman that I love, and in four weeks after I married her, she should commence a criminal correspondence with such a worthless man as Joseph Osborne, that has a wife and five children; that took the money out of the store, by little at a time, and gave it to him, and I could not leave the house, if I only staid fifteen or twenty minutes, come in I would catch him in the house or just going away. On the 14th of April, 1847, I came to the house and found it fastened up. I thumped at the door and called quite loud; received no answer; walked round to tother door; Osborne was just stepping out at the door; I walked in; found Nancy very much confused; asked her how the door come fast; she denied it; I told her she and Osborne was shut up together; she denied it. On the 2d of April I ordered him not to come to my house any more; after that she would meet him out at the stable; the old coopers' shop; behind the smoke house of nights you might see where they stood and their tracks were they met. I found that I lost or missed twelve dollars and sixty cents that she took and gave him; I don't know how much more, and from thirty to fifty lbs. of pork at one time, to Elligood, a family that kept a watch for them and carried news to each other privately. He had Milford Saunders employed to conjure for them also; also, Alexander Elligood and daughter, they furnished her with some poison stuff that she would put on my clothes and head, that would almost distract me; I had to hire my washing from home and quit sleeping with her to keep from filling my clothes full in bed. The life she leads me, I cannot describe it. Her children are not mine, Joseph Osborne is the father of them both, and she is now with child by him. * * *
* * * if she should live, if it could be so, I think that it would be sufficient proof of all that I have said concerning the life that she and that man has led me. I believe there is persons that know of their criminal correspondence, but they keep it from me; they may come out after I am gone if not, the two children will speak for themselves, their favor will be as good proof as those acquainted with him and the family will want. I don't know, according to the marriage contract and my will, whether my estate will have them to raise up to seven years old; if the law should compel my administrator to raise them two illegitimate children to that age, I wish him or the county to put them to good masters, as I disown them as being children of mine. If they were, it would be a great consolation to think my labor and industry should *Page 517 
go to my offspring. What I have here wrote is the truth, the Lord is my judge, and I wish it published to the world, as it may be of service to some people. The Great Jehovah, I hope, will pardon me for what may hereafter take place. If it should be printed, I hope it may be put in good form and correct bad spelling.
 JOHN WINDSOR.
Wrote May 1, 1850. Endorsed, I hope some friend of mine may have this made public.
 JOHN WINDSOR.
Mr. Stuart was examined by Mr. Bayard.
My house is one hundred and fifty yards from prisoner's; the person passing when I saw prisoner with the gun, was Alexander Elligood; after he told me he had shot his wife, he went into his store and locked the door; I then went up stairs, and when I came down again, I demanded to be let in to him; he unlocked the door, but slightly opposed my entering. He was excited and violent in his manner. Before he shut himself up, Captain Stewart came in, and Windsor objected to his coming into the store. He asked us not to confine him. We got from him the gun, (a double barrelled one,) a pistol and a long dirk. In about an hour he fell from his chair, from exhaustion. Up to that time he walked in a hurried way, and talked about Osborne and his wife's adultery; about her blowing hot stuff on him; about his will and the act he had done; prayed for forgiveness; asked me to write to John Windsor and tell him he had made him executor and principal heir, and request him to come immediately. He did not try to get away.
Some days before this, Windsor had called on me and told me of his wife's infidelity with Osborne; showed me some tracks as the evidence of it. I thought they were his own tracks and children's. He seemed to be serious. On another occasion, he complained to me that his wife had thrown poison on his head, and combed dandruff out to show that it was true. He said his head was all on fire.
Re-examined by Mr. Saulsbury.
His statement of the matters I have spoken of just after the deed, though excited and hurried, was connected. It did not strike me as different from what was his usual conversation, except his excitement.
James Downing. — Was sent for to go to the prisoner's soon after he had shot his wife. I found him in the store walking about, much excited, sweating freely, but in other respects much as usual; he held out his hand to me and said, "O! Mr, Downing, I have shot *Page 518 
my wife!" He then said that he had taken his gun that morning to shoot Joe Osborne, but missed him; that Rollins or some one, gave Osborne notice by a sign; that he returned, put away his gun, took a pistol and bowie knife, intending to kill his wife with the bowie knife; that he went up into the garret where his wife was weaving and said to her, "Nancy, you are going to die, your time is short;" she said, "yes, Captain Windsor, we are all to die, and our time is short." He said he then went down stairs and got his best pistol, the one that was surest fire, and went up again and said to his wife, "Nancy, I have often told you that you would tremble in my presence;" that she ran out of the room and halloed murder, that as she ran there was a line across the room, with some bags hanging on it, and as she raised her arm to fend the bags from her head, he fired and she fell; that he walked down stairs, went into the store and took from half a gill to a gill of laudanum. He said he should not live twenty minutes, he was certain from the effects of the laudanum. He then said he went with the intention of killing Osborne that morning; that he intended to kill his wife, and then destroy himself with laudanum. He said there was five or six he should like to kill, and he would then be satisfied, viz: Milford Sanders, Aleck Elligood, Aleck's daughter, Joseph Osborne, his wife and himself. He showed me where his key was, said he should be here but a very little time, as the medicine was operating; told me to take care of that key and his papers until John Windsor came. By this time he become very sick, and making an attempt to sit down he fell upon the floor. I went to him and raised him in the chair; persuaded him to go in and lie down on the bed; he said he wouldn't lie down on the bed, that they had too much poison stuff there for him; that he would go in the parlor and lie down on the sofa. I went along side of him and James Stuart on the other side. He got to where his writing desk was on the counter, opened it and took out a pocket pistol. Stuart took hold of it, and said he could'nt have that. He said you might let me have it; I don't want to hurt you nor any one else; but he gave it up to Stuart and went in with me and layed down on the sofa. He then became very sick and vomited laudanum; after that he said Mr. Downing, "I am afraid there is not enough remaining in me to kill me," and asked me to give him more. I told him he could not have any more. He said, "oh, give me more, I want to die, and I will die; I never intend to be a public example." He then became calm and still, and I left *Page 519 
him and went up stairs to see Mrs. Windsor. She sent word she wished to see him. He went up, took a seat by her side, and I went into the next room, leaving several with them. He did not stay more than a minute or two, but went down stairs and I with him. He lay down on the sofa again; in about an hour his wife sent for him to go up again; he refused to go, saying he felt too weak; I advised him to go, and led him up stairs again; he sat down by her bed-side, took hold of her hand. She said, "Captain Windsor, you have often said these children were not yours, but before God and all these people they are yours, and you ought to do something for them." Ah, said he, "Nancy you need not talk about these things now," (still holding her hand,) and rising said, "God bless you," and left her. She called him back to look at her wound. He said no he was not prepared to see it then, and he went down to the sofa again.
I omitted to say that when I first went in, he said he had had it in contemplation for six months to do this act, but he wanted to kill Joe Osborne first. He had told me before, that he expected to kill Osborne some time. I told him he ought not to be harboring such things in his mind. I asked him if he knew what would be the consequence, if he did such an act. He said yes, he knew what would be the consequence; he never intended to go to the gallows; that if he should do such an act, he would take his own life, or destroy himself. I went so see the prisoner after the fall court. He asked me to state to him what my evidence would be against him. I stated it to him; when I got through he looked at me very earnestly, and said, "Is that your evidence, Mr. Downing?""Is it that bad?" I told him it was. "Well, said he, "it is a bad chance with me then." Captain Windsor and I had been very friendly. He was my neighbor. I saw the wound in his wife's side, under the arm. Saw the pistol bullet when it was taken out of her. She died about 3 o'clock, P. M.
By Mr. Cullen. — The double barrelled gun and small pistol were loaded. The bowie knife was ten inches long.
By Mr. Bayard. — The prisoner was about seventy years old at the time. Married his wife in 1847 or 1848. She had two children. Her age might be twenty-three or twenty-four years. Prisoner was jealous of Osborne. He often told me that his wife and Osborne were too intimate. He could find no particular reasons, but had seen them look at each other and smile; that he had seen *Page 520 
tracks about the smoke-house, c. I reasoned with him against it, but without effect. He thought I was unreasonable not to believe it. These conversations were before as well as after the birth of his second child. He talked with me about their blowing poison on him. This was before his wife came back from her father's. He said he had got Milford Saunders to conjure for him to get his wife back, but he couldn't succeed; and they then turned on him, to poison him. He thought they had something they threw on him, that made him burn; I told him such things could not be. He said Dr. Oram said it could, and they could throw it at some distance. He implicated Aleck Elligood, also his daughter, and an old black woman who came to his store to get whiskey, and while he was drawing it, threw some on him. He said his wife threw some on him whilst riding in a carriage shortly before this; that she blew it out of her mouth; that he felt it at once, and his mare did too; it made the mare start to run. I have known him to wash his own shirts and hang them out to dry, for fear some one would put the "hot stuff" on them. There were auger holes bored through all the partitions to see from one room to another; and out doors. He said the hot stuff affected his nose and head and would go through him and then wear off. When I reasoned with him he would sometimes appear satisfied, but always returned to the subject. I knew Mrs. Windsor well. There was nothing in her conduct to excite even a suspicion in my mind, of infidelity to her husband. She was a peaceable, quiet, inoffensive woman. Osborne is a laboring man, married and with a family of children. He lived in Middleford, where Windsor lived. I never saw him at Windsor's house after he was told to keep away.
When I saw Captain Windsor in prison, he seemed to have the same opinions about his wife's infidelity, and about the poison. Did not seem sorry. He wanted me to take the children and raise them. He said they were not his, but he felt it his duty to do something for them. He often talked to me about conjuration; he believed in it a good deal; I do in some points, like other people.
By Attorney General. — In some of the conversations he would seem to be persuaded that the children were his; that the oldest one resembled him. He appeared to think a good deal of them; petted them very much; at other times he would deny the resemblance and the legitimacy of the children. He said he wished to kill both Osborne and his wife; for if he should die, Osborne and his wife would *Page 521 
run off together; and if he should kill Osborne and himself, his wife would get the property. He attended to his business all the time as usual: kept every thing in good order, until a week or ten days before this event, when he was taken sick. He was a careful, provident, industrious man; often ailing, but would go out again to his business as soon as possible. I saw him on Monday before; he was then better and got cheerful in conversation. Dr. Oram lived in Middleford; called himself a botanic doctor. During the conversation I had with Windsor in prison about my evidence, he said I need not state any thing only what I was asked. Captain Windsor once told me he had taken his wife home to her father's to remain. He said when he left, she followed him out and asked when he was coming after her, he told her not at all; that she began to cry, and he gave her twelve dollars, and told her she must do the best she could for herself. I asked why he had so left her. He said because she was in the family way by Joe Osborne, and he would have no more to do with her. In three or four weeks afterwards he went to see her, and repeated his visits several times. I asked him why he visited her, if he believed what he said of her. He replied that there was a marriage contract between them, and he wanted to get her home again; that he had learned that if she remained off the marriage contract would be void, and she would come in for a third or half of his property.
By Mr. Houston. — About two weeks before the death of his wife, he told me he was going to draw some pictures and shoot at them; that it was about the change of the moon, and that was about the time to shoot at pictures of witches; the next I saw of him he had a gun and a bible, and was going to his stables. I soon heard the report of a gun. He then went to his smoke house and burnt the pictures which he had shot; rolled up the ashes and wrapped them in paper, and asked me to go and throw it into a running branch. I objected, but he said as I was working for him the lost time would be at his expense. I told him this was a new feature in the mode of shooting witches, I had heard a part but not all of the process. He said he got it out of the bible, and mentioned where; the burning incense, throwing it in a book, c., burning witches, c.
By Mr. Brown. — What did he say this was all for?
Witness. — To stop the conjuration and witchcraft.
By Mr. Saulsbury. — Is not this a very common superstition in these parts? *Page 522 
 Witness. — Yes.
By Mr. Brown. — Was no effort made to reason with the prisoner, or to restrain him.
Witness. — I did not reason with him, because I thought he had more sense than I had. I advised Osborne to bind him to the peace, but Osborne was not afraid of him, and' thought it would only aggravate the matter.
Dr. James H. Fisher. — Saw Mrs. Windsor between 7 and 8 o'clock; she was wounded in the right side of the body opposite the sixth rib; probed the wound; could find no ball; sent for Dr. Shipley; concluded the wound was mortal. I was sent for two or three times by Captain Windsor; found him in the parlor on the settee. He spoke to me and said he had done a desperate act. He said he had taken laudanum, and had taken an overdose. It had vomited him. He asked for more laudanum; the proper quantity. I refused. He then asked for arsenic, and said he had arsenic, but he was here under guard, and they would not let him go to it. I refused. He said, "I must die; I will die; I have disgraced myself and will suffer myself to be disgraced no further." I went again to Mrs. Windsor's room. She asked me if she could live, I told her I thought her prospect for life was very gloomy. Dr. Shipley told her the same. I went away, and returned at 3 o'clock, found her in the article of death. She recognized me, and expired at fifteen to thirty minutes past 3, P. M. Made a post-mortem examination the next day; traced the wound from opposite the sixth rib; the ball passed the seventh, broke the eighth rib, passed through the liver behind the intestines, without wounding them, struck the spinal column, wounded the kidneys, and was found in the cavity of the pelvis, on the left side. [Produces it.] That wound was the cause of Mrs. Windsor's death.
By Mr. Brown. — I attended Windsor's family from June, 1849. I thought him suffering from functional derangement of the liver, with appearance of hypocondriasis. He said he had burnings on his arms, head, throax, in the nose, and smelt sulpher. I examined the parts said to be affected, and found no appearance of disease. I told him there was no disease there, but I suspected a derangement of the liver. He said yes, there was an abscess there. I now concluded he was laboring under the horrorsof delusion. I was called again on the 2d of August; same symptoms. Was called 5th of August, to see Mrs. Windsor in her confinement. Captain W. was *Page 523 
there, well, pleasant, jocular, in good spirits. In October I visited him again; the old symptoms again complained of; did'nt believe them real; told him so. He said he as much believed it as he believed he was living. He said, "they are determined to kill me, they will kill me in spite of all you or I can do." He said he was burning all over, particularly in his nose; begged me to examine his nose. It was slightly dry as with a cold. I said, Captain it is all imagination, but that is a disease, and you must be treated for it. I said to him, they will say you are a hypocondriac; but no matter, there were few persons who escaped such attacks. I advised him to travel, and prescribed medicine. I thought him then laboring under lypemania; this was in October, 1849; I concluded that the disease was periodical; had acerbations and remissions about every fourteenth day. In February, 1850, he hinted to me that he was poisoned. I told him it was not so. He said then there was something clone to him. I was called again in March; found him under same symptoms. He insisted on my hearing all his troubles. I told him again his ailments were not real but imaginary; a disease of the nervous system. He said he knew he was poisoned, and his wife had a hand in it, for he saw her putting it in his mush, he knew it by the blubbers that rose on it. He did not eat the mush, but they had managed somehow to get the poison into him. He said he did not know why his wife wished to destroy him, unless it was because he was too old for her. The people thought she loved him, but he knew she did not love him; she loved another better. He said they managed to blow poison stuff on him from a distance — this caused the burning. He said they blew it on his horse; that his wife could do it, and had done it returning from her father's; that she did it twice, and he told her if she did it again, he would throw her out of the carriage. He said his wife was false; that she had taken another man into her chamber by means of a sheet thrown from a window, and it was a married man; that this man was the father of the children; he would'nt mind this, if they would let him alone, but, he added, "they will kill me, and they will do it in such a way that I can prove nothing on them." He said if Joe Osborne did not let him alone, he would be compelled to do what he would be sorry for. He spoke of Elligood, Saunders and others. I told him it was all a delusion of the senses. He said if a man struck you and knocked you down, you would know it was so; but that would be no more certain than his conviction. I told him it was *Page 524 
dangerous to indulge such notions; spoke of cases where it had led to fatal consequences. He said he knew all about them, and lent me a book containing a report of the case of Wylie, who shot Dr. Wilson for the seduction of his wife. When I visited him again, he wished to repeat all this, but I declined, and his wife said, "oh, the Doctor does not wish to hear about your witchcraft stories."
He pointed his finger at her and said, "she is the principal actor in this murdering business." He combed dandruff out of his head and showed it to me for poison. His wife said she was not afraid of him; he had threatened some of the neighbors, but she could manage him. She said no wonder he was sick, for he washed his head through the night frequently with cold water. She said he had threatened her. He said, "Nancy, I never shall hurt you, unless in self defence." He accused her of attacking him with the fire tongs, and said he drew the sword cane and would have run her through if she had advanced. I was called again the last Saturday in April — same symptoms; rather more cheerful, but looked distressed in his countenance. The next day he sent for me to see the poison he had discharged. I told him there was no appearance of poison there. He wouldn't give up the idea from this time till her death. I concluded that he was a monomaniac. The Sunday before the death of his wife I found him shut up in his store, lying on the counter, with new muslin sewed together for a covering. He said his own clothes and bed clothing were poisoned. He said he was now relieved from the poison; he had discharged it. I asked if he had taken any nourishment. He said he was afraid to eat anything but hot water and crackers. I advised milk and he asked his wife for it, and she brought it. He asked if he should put some brandy in it. I said he might. He mixed it, offered it to me to taste and then drank. He walked with me to Rollins' store, and was quite cheerful. I saw him again on Monday evening. He said he was still very miserable. I did not see him again until after he shot his wife.
Question by Mr. Brown. — What, on the whole, is your opinion of his condition.
Answer. — I thought him first a hypocondriac; then a lypemaniac; then a monomaniac. I thought sometimes one, sometimes the other by turns. I advised his wife to leave him the Sunday before he killed her; I told her that he was a dangerous man; I said she had done right in leaving him before; and would advise her to do it *Page 525 
again; I said to others I should not be surprised if Captain Windsor should kill some one; I believed his mind was disordered; that he believed things to exist which did not exist; and could not be convinced to the contrary.
By Mr. Saulsbury. — The case I stated to him was that of Sharp, who was hanged for the murder of his mother, done under the suspicion of witchcraft. He said he knew all about it, and, related the circumstances. He said at one time he believed the Almighty allowed some, people to do what they pleased to others; and referred to the scriptures. He handed me the report of the trial of Wylie, for the murder of Wilson, in February or March.
Question. — What is hypocondriasis?
 Answer. — A mental disease, having its origin in the region of the liver, which is the hypocondriac region. The symptoms are delusion of the patient as to his own notions of his disease; affection of the gall, bladder, indigestion, cool skin, dry skin, load on the tongue, fur, suspicion of friends, religious despondency, ideas of peculiar calls from Providence to particular duty, c.
Monomania is the fixed stage of the disease of hypocondriasis. The first may be overcome by reason — the other not.
Lypemania and monomania are a chronic affection of the brain, unaccompanied generally with fever. In the former the sorrowful and depressed passions predominate and painfully disturb the patient. In monomania the cheerful and expansive affections predominate and excite the more agreeable sensibilities, and the delusion is confined to one subject or class of subjects. Captain Windsor was gloomy; sad; the depressing passions predominated; he was under delusion on two subjects; the infidelity of his wife, and his being, poisoned by witchcraft.
Question. — Is monomania a mental or bodily disease?
 Answer. — The brain is the seat of the mind and monomania is considered a mental disease.
Question. — What is the difference between illusions andhallucinations?
 Answer. — An illusion is the result of morbid action of the extremities of the nerves on the brain, producing disease there; a distorted and altogether false view of things. A hallucination is a disordered action directly of the brain, creating false notions.
Captain Windsor could compute interest well; I tried him; I tried him also on history; on scripture; on his memory of old events *Page 526 
within his own observation. He was right in all these matters and everything else, so far as I tried him, but on the subjects mentioned.
By Mr. Brown. — May not a man be as mad on one subject as on twenty?
Answer. — I believe it.
By Mr. Saulsbury. — Have you not stated to Dr. Stuart and others that Captain Windsor was of as sound mind as yourself or others.
Objected to.
Mr. Brown. — It is not competent for a party to contradict a witness called by him; and a witness called for a party remains the witness of the party to the end. He endorses his credit, and he must not bring forward a witness as credible, holding in his hands the means of destroying him as incredible. And if destroyed as to one thing his testimony is destroyed altogether.
The Court sustained these principles, but excepted this case from them, on the ground that evidence relating to insanity had been introduced by the defendant's counsel, though objected to by the State. It was allowed however, only for a particular purpose, to explain or qualify the declarations of the prisoner at the time of the deed; the cross examination of Dr. Fisher went beyond this and opened the defence of insanity generally, and was not objected to because of a misconception of the extent to which the court's ruling went. Doctor Fisher was called by the State for purposes entirely distinct from this; perhaps necessarily called, as he was the physician who conducted the post mortem examination. He was examined in chief solely in reference to the death and the cause of the death of Mrs. Windsor, and was cross examined by the defence solely in reference to the question of insanity. The question then was, whether as to such a witness so introduced and so examined, the party who called him was precluded from showing that he had previously stated the facts in a different manner.
The rule that a party shall not impeach or contradict his own witness is subject to several exceptions, and generally in reference to proof of contradictory statements, Mr. Greenleaf states the weight of authority to be for admitting the party calling the witness to show that he has been surprised by statements made contrary to previous statements made to him; or to show collusion or deceit; and we think it necessary to the principles of justice to admit it in this case. (1 Greenl. Ev., 520, § 444.) Dr. Fisher, though called by the State for another purpose, was used, and irregularly used, *Page 527 
by the defence, in reference to this matter; and if in cases of surprise the courts incline to admit contradicting evidence, there is stronger reason for admitting it in this case.
The following question was then put to the witness: — Did you or not, on the 2d of May, 1850, say to or in the presence of James Downing, that you had examined John Windsor upon history, scripture, and worldly affairs, and that his mind was as sound as that of any person, except that he believed a little in witchcraft?
Answer. — I said that John Windsor had as accurate knowledge of history, particularly of events in this State, and a better knowledge of scripture than I had; but I never said that his mind was as sound as that of any person, except that he believed a little in witchcraft.
Witnesses for the defence: —
James Anderson., Esq. — Has known the prisoner for fifty years. Has not considered him of sound mind for the last fifteen years. [Objected to; and the court ruled that the opinion was of no avail as evidence, unless the witness gave sufficient facts to sustain it.] In 1841 or 1842 he sent express for me sixteen miles, and said if I did not come soon I should not see him alive. I went. He said there was an abscess formed within him; that he had made a will and left me executor; showed me his money and gave directions about his estate. I couldn't see that anything ailed him, and paid no attention to him. This was in his first wife's time. After his second marriage, he complained to me of his misfortunes, that he had married a prostitute, and wished me to inquire about her. Told me about the Osborne affair. I knew enough of her to know that his suspicions were unfounded. My opinion of his insanity is founded more on his looks and manner than otherwise. His personal appearance is changed greatly in the last few years.
By Mr. Cullen. — He conducted his business very badly, judging from his statement to me in 1842. I refused to believe the adultery story, not only from my knowledge of his wife's character, but from my own knowledge of his own. I knew he had been in the habit of imagining things for the last fifteen years. He said he had a vessel that cost him $8,000, and he had sunk all by trusting unfaithful agents. He is my cousin.
Joseph Osborne. — Was on kind terms with the prisoner for many years. In April after his last marriage, he suddenly told me to keep away from his house. I asked the cause; he said he would *Page 528 
tell me some time. After that I never went to his house. I never smiled, nodded, winked at, or took any liberties with his wife in my life. After he had directed me to leave, I heard he was jealous of me. I sent for Windsor. He came to see me; I told him he was altogether wrong; that I had never harbored a thought of his wife. I reasoned with him. He raised his hands with much animation, and said he would not believe it if God Almighty was to come down to earth and tell him so. He said he saw me in his back yard on the night of the 6th of January, 1847. I was not there; and I told him I could prove where I was that night. On another occasion he told me if it was not for the stain of blood on his conscience, I should not live five minutes. This was in the summer of 1849.
By Mr. Saulsbury. — He farmed; kept store; did business as usual; saw no change in his habits of business; talked rationally on other subjects.
Eliz. Windsor. — Lived in the house adjoining prisoner for twenty-five years. I have sewed for him; washed his clothes, which he said were poisoned; and baked for him, when he got into these notions. His wife connived at it and paid me. I did it to satisfy him and make him comfortable. In April, 1850, saw him whipping poison out of his bed clothes. I went to him and told him of the folly of such conduct, but he persevered. On Monday, April 28th, he came to my door, threw in a piece of muslin and said, make me a sheet as soon as possible and wash it out; my bed clothes are full of poison. His eyes glared and looked green. This is the first time I ever was afraid of him. He said they threw the poison through the glass — Elligood and others. I told him it was impossible and I wished they would quit him and come at me. I could not convince him.
By Mr. Cullen. — Sometimes he attended to his business — sometimes not. He was not like he used to be.
John K. Windsor. — Proved a number of books, letters, c., in prisoner's hand writing — two wills drawn by Mr. Cullen; the first revoked; the least sealed up, and called from the custody of Mr. Cullen.
The papers were admitted without objection. They were memorandums made by the prisoner on almanacs, and other books; notes and papers in his hand writing; proved to have been found at his house after he was taken to prison. They were such as these: "14th of April, found them fastened up together — wife confused, c. — *Page 529 
quarrelled with wife about it — wife abused me about Osborne — she would delay milking till dusk to meet O. — traced their tracks — showed them to her and John Rollins — caught them together afterwards — she went home 5th of January, 1848, to her father's — before she went, she took a saunter in the garden to the grape house, touched the strainer as she passed, and O. met her there — saw the track plain — saw him in the coopers' shop beckoning for her. Jan., 1847 — saw wife and O. winking — he patted her on the shoulder. Feb. 14 — she went to sec O. March 14 — wife angry because she can't see O., which she says is Heaven — says she don't like me. May 2 — they met out — so every opportunity when I was sick. He poisoned my dog. July 6 — wife abused me — said I was a fit associate for Betsy Brian. Aug. 20 — she was with O. last night — I looked sulky in the morning and she took the hint and, denied it. Oct. 11 — she was with him in stable. I now found out that rattling the strainer was a sign for him. April 1 — said she was not satisfied with me; I need not accuse poor O. June 7 and 9 they were together; also, 28th and 29th. She erased the tracks with a hoop. She made sport of my accusations. She found out she was pregnant and tried to make me believe it was mine. I walked with her, and going by where the strainer hung, she touched it; knowing it was a sign for O., I accused her of it and she "blowed me," which came near killing me, c., c."
These memorandums contained almost a diary of his suspicions, his wife's conduct, c.; a note of every one who came to the house, showed suspicions of almost every one. It stated many instances of abuse of himself by his wife, both by words and blows; most aggravating and tantalizing language, c.
There were several letters to John Windsor, of Wilmington, one dated April, 1849, the other April 27, 1850, informing him of the conspiracy to poison him and the belief they would soon accomplish it, and requesting him to come immediately, stating where his will was — marriage contract, papers, money, c., the latter being in a trunk deposited at Rollins' store. There was also a rough drawing found in the bible, representing persons as described by the above memorandums. Will, May 4, 1848, disinherits his wife's son. Will dated 31st May, 1849, disinherits the children as illegitimate. Marriage contract 5th December, 1848, wife to have certain property and $50 a year during her husband's life or decease; the children *Page 530 
of the marriage, if any, to he his heirs; added in prisoner's hand, "if the children is his or child."
Dr. Elias S. Richards. — Attended John Windsor from 1844 to 1849. From 1848 he was under distress of mind; would send for me in great haste; fancied he had an abscess in his side. I thought most of his sufferings imaginary; reasoned with him without effect; I thought his disease dyspeptic. He complained of the "hot stuff," said it was thrown on him in bed, through the window; that it produced burning sensations in his nose, head, stomach, c. I don't think I ever succeeded in convincing him this was not real. He named the persons (as before) — said his wife hired them; often spoke to me of his wife's infidelity; said her children were not his, I prescribed but little medicine for him. He would take nothing but cathartic pills. He said Osborne got into his wife's chamber over the porch, for he could see the sand on the porch posts. He was laboring under delusions — monomania — I have attended him in prison — the same delusions continue — he thinks his water is poisoned there; sent for me to analyse it. Thinks the sheriff and Mr. Cullen are in it now.
I have heard nearly all the evidence in this case — all the medical testimony.
Question. — From that evidence, is it your opinion that, supposing it true, the killing his wife by John Windsor, was an act of the will, or was the result of insane delusion ?
Mr. Cullen. — The Doctor is not an expert in this matter; he has had no connection with insane patients, and his being a doctor does not qualify him to give an opinion. He has not heard the whole evidence. Even an expert ought to be asked only whether the facts were evidence of insanity. What gives the doctor the right to decide this question for the jury? If he gets it as a doctor, does every doctor have it — aleopathists; homopathics; botanics; cold watermen; root doctors; conjurers and all? If so, the doctor who advised Windsor to shoot the witches may come here and tell the jury that this will qualify him to do murder with impunity.
Mr. Bayard. — Would not be drawn into a discussion of this whole subject now, and learning that Dr. Rickards had not heard all the evidence would modify the question. As to the doctor giving an opinion on the question to be decided by the jury, it is the case with every scientific opinion. It does not bind the jury, but it is to be given to be considered by the jury. Just as a doctor is asked *Page 531 
whether a wound is the cause of death. It is a fact to be found by the jury, but it is yet one that a scientific witness may give an opinion on. The weight of his opinion will depend on his weight of character.
Question. — Would you judge from the symptoms proved by yourself and the other doctors, that they indicated delusions which would probably lead to acts of violence in reference to the objects of the delusion.
Still objected to, argued and admitted.
Witness. — There is such probability, if the delusion is strong enough.
By the Attorney General. — Windsor's symptoms were about the same during all the time that I attended him. He conversed well on other subjects. It is not uncommon to have dyspeptic or hypocondriac patients. I did not subject him to any particular tests.
Dr. Charles Stilwell. — Is a physician, aged 46 years, graduated in London, at the Royal College of Surgeons. Has had very extensive experience of lunatic and insane patients. My father kept a private lunatic asylum near London, fifteen miles on the road to Oxford; I was in this family until sixteen years of age; was then apprenticed to my brother, a physician at Uxbridge, two miles distant — after I graduated I settled at Ewel, near Exford in Surry, and had usually from two to five patients in my own house. My professional education was peculiarly directed to what are usually called diseases of the mind — I was in this practice eighteen years; after that I was at an asylum for the insane in Trinidad, West Indies, at Port Spain, where I had the entire control of an average of sixty to eighty patients; I was there two and a half years; then I came to this country, and was one year and ten months with Doctor Kirkbride, at the Blockley Lunatic Asylum, near Philadelphia; my post was there to supervise the attendants on the patients; to visit all the patients; to converse with such as were recovering and deliver lectures three times a week. The average of patients there is two hundred and forty; my brother has charge of a lunatic asylum, the one my father formerly had, and I frequently visited his establishment; I have therefore all my life been with the insane. I came here at the request of Mr. Bayard, to see the prisoner, and was introduced to him by Mr. Robinson, not as a doctor, but as a friend. My first visit of an hour and a half, was on Monday last; I have visited him several times since; and seen him daily in court. *Page 532 I never saw a more decided case of monomania. I state positively that a certain class of false ideas has gained such a control over him as to supercede entirely the control of his will. His appearance and manner are perfectly characteristic of insanity; and that no medical man accustomed to insane patients can mistake; it is as plainly written in the countenance as drunkenness, libertinism, or any other excess is; or as plain as its opposite sanity is. His delusions all had reference to his wife's infidelity and the conspiracy to poison him. I came away fully convincted he was under the influence of a monomanic delusion, which would be very likely to lead him to just such an act as he is on trial for. This was not simulated. His manner and appearance here are such as no man can mistake. There he sits, and has sat since last Wednesday, with a paper over his head to shield him from poison, watching every man that comes in with an insane quickness of eye, and crouching under the fear of poison; and yet he is the most unconcerned man in this house about his trial. I went to see him yesterday morning; asked him how he did, he said in a low whisper, "they put it in my water, and I slept none all night." He said nothing about and has never referred to his trial. He does not seem to remember that he slew his wife, and this is characteristic of the disease. I am as certain John Windsor is an insane man on these subjects of his delusion, as I am that I am a sane man.
Question. — You have heard all the evidence in this case. Assuming the evidence to be true and that the jury believe the facts deposed to, are you of opinion, as a medical man, that the prisoner was insane when he slew his wife?
Objected to.
Attorney General. — This is a question of such doubt that the matter was referred to all the English judges, and they thought that such questions ought not to be allowed. (47 Eng. Com. Law, 129, Russ Ryan, 456; Br. Cr. Cases; Beck Med. Juris., 771.) It is the very question to be tried by the jury. Let him state the facts and the jury draw the inferences.
Mr. Bayard. — The settled practice is to admit opinions of medical men on this question; the practice in England as well as in this country; but recently on a question put to all the judges; without a case; without argument; made in reference to a matter of existing excitement; they recommended a change of the law on this subject. *Page 533 
It would indeed be a servile submission to authority to follow them in this; reversing all previous practice.
The opinion of the physician in no respect controls the decision of the jury; they will give it only such respect as they think it deserves. As a matter of science, it is no more than to examine a carpenter whether a house or ship has been properly built; where the proper building the house or ship is the matter in issue. It does not differ in principle whether you ask a doctor if a certain wound proved, was in his opinion, the cause of the death that followed; or whether a certain disease proved, was the cause of a certain action that followed. In both cases it is mere opinion, and the jury decides the matter at last. (1Mood Rob'n, 76, Rex vs. Oxford; 38 Eng. Com. Law, Rex vs. Offord; 24Ib., 259; Ab. Rogers case, 279; Reg. vs. McNaughten; Freeman's case, 471.)
As to the answer of the judges, the opinion of Justice Maule shows that it was given under such circumstances as to entitle it to but little weight as authority. Neither does it meet the case now before the court, for Doctor Stilwell does not depend for his opinion on the evidence exclusively of other persons; he formed his judgment of the prisoner's insanity before he heard any evidence in the case.
The questions put to the judges, arose out of the case of McNaughton, who assassinated Mr. Drummond, mistaking him for Sir Robert Peel; it has not been adopted or assented to by any court in this country; one of the judges regretted that the questions were ever put; and another that they had ever been answered; and after all, it does not come up to the case now before the court.
Mr. Brown. — Argued the same views at length.
Mr. Cullen. — Replied.
By the Court.
In all the cases referred to, except Rex vs. Wright, 4 Russ Ryan, 456, (and there only a doubt is expressed,) the principle is recognized that a medical witness, conversant with the disease of insanity, who never saw the prisoner previously to the trial, but who was present during the whole trial and heard the evidence, may be asked his opinion as to the state of the prisoner's mind, at the time of the commission of the alledged crime. We do not regard the answer of the bench of judges to the question put by the House of Lords in 1843, as controverting this principle. Their answer seems to be directed more to the form than the substance of *Page 534 
the question put, and to admit in substance the propriety of the question. They say "the question cannot be put in the precise form stated; for by doing so it would be assumed that the facts had been proved. When the facts are proved and admitted, then the question, as one of science, would be generally put to a witness under the circumstances stated in the interrogatory."
We have examined the form of the question objected to by the bench of judges; and the questions put in the several cases referred to, viz: Bellingham's case; Oxford's case; Offord's case; McNaughton's case; Rogers' case, and Freeman's case; comparing these questions and applying to them what we regard as the true principle, we allow the question to be put in this form:
Question. — You have heard all the evidence in this case — supposing the jury to be satisfied that the facts and circumstances testified to by the other witnesses, are true, what is your opinion as a medical man of the state of the prisoner's mind, at the time of the commission of the alledged crime? Was the prisoner, in your opinion, at the time of doing the act, under any and what kind of insanity or delusion; and what would you expect would be the conduct of a person under such circumstances?
Witness. — He was under the influence of a diseased imagination, arising out of delusions which had immediate relation to the act committed; those delusions were so powerful as to completely subvert the power to control his will in regard to the murder of his wife. He was suffering under the form of mental abberration that is technically termed monomania; and I would expect that under the influence of this peculiar disease he would be impelled by an imperious necessity, in as much as he believed that these delusions were realities; and they would have a tendency to produce precisely the same or greater effect on his mind, as such facts, assuming them to be true, would have on a perfectly sane individual.
The disease of insanity, whether in this or other forms, is subject to paroxysms, overwhelming judgment and reason and will. Such patients are generally in a passive state in relation to their disorder, but even when passive, you may by putting questions, excite the erroneous train of thought which belongs to their disease. They will never admit that the errors of judgment are errors; for if they did so they would be no longer insane; but being under a firm conviction that the delusions are true, they reason upon them as a sane person reasons on facts. Insanity is not always an inflammatory *Page 535 
disease; laudanum is sometimes administered in large doses to allay the excitability, enough to poison a healthy person; so in other nervous diseases, as in tetanus or lock-jaw.
Insanity is subject to the same general laws as other diseases of the body, gout for instance or rheumatism; and is frequently transmitted in families, but not in any particular order. There is no inheritance of mind; the mind is the same in all; there is an inheritance of blood, and bodily organization, and the diseases connected with them, and their effect on the mind. The effect of insanity on the will is the same, whether it be general insanity or monamania. The patient's mind acts under the influence of the delusion in the latter case as much as in the former, and the acts of the patient are not acts of the will, but of the delusion. The will is totally subjugated; the power sufficient to resist the delusion would be sufficient to remove it, as it would require reason to do either. Yet a person under such delusion would act as to all other matters as wisely as if he had no monomonia at all; he will remember the events of his life better than a sane man. I express the decided opinion that the act here was the result of delusion.
By the Attorney General. — In testing the reality of these delusions, I reasoned with him without any effect; I know of no other test; medicine is no test; there is no medicine for a mind diseased; medicine will operate on them as on others. Question. — Why was it that the laudanum did not kill him? Answer. — Because he vomited it up. The declaration of the prisoner at the time that he was crazy, would be no evidence of insanity, but the contrary. If he said I was crazy when I did it, this would be conclusive evidence that he was sane at the time he said this; but though said the same day, it might be no evidence of sanity when the act was done. It is not characteristic of monomania to admit the act and defend it; nor is it any evidence one way or the other, to say before the act, "if anything serious happens, don't disturb me."
By Mr. Brown. — Where the delusion is from depression, exciting causes will have a tendency to relieve it; and where the delusion is accompanied by great excitement, the abatement of excitement relieves.
Kendal M. Lewis; (in reply.) — Has known prisoner fifty years. He came to me when his wife was gone home to her father's to buy a negro woman, I told him I could advise him how to get his wife back; I asked him if he had read Aesop's Fables; and told him the *Page 536 
story of a man whose wife had left him, who gave his servant money to go to market and buy provisions for a feast, giving it out that his master's wife having left him, he was to be married again that night; the news soon spread, and the wife came home to stop the wedding. He laughed at the story. I knew nothing of the jealousy or poison, and had never heard anything against Windsor's honesty or intellect. He believed in witchcraft and so do I, and can prove it from the bible. I don't believe in shooting witches, though the practice is common. More than thirty years ago I saw Windsor and others, attempt to destroy a witch by piercing a picture with a marling spike. They had no gun to shoot with.
Lot Rawlins. — Prisoner transacted business as others do. Saw no difference in him up to this time.
James Stuart. — Prisoner was a correct business man; never saw any change in him up to this time. I never had an idea that he was insane.
William Allen. — Has known prisoner three years; was tenant on his farm; never had any idea of his insanity. Directed me in the management of his farm properly. Never saw any change in him up to the death of his wife.
William W. Dulaney. — Knew him up to 1842, and met him twice after that, in company with his wife. 1 saw nothing about him that suggested the idea of insanity. He was long in the habit of keeping a gun, sword and pistols. I have done business with him since he was in jail. He executed a bill of sale for a boy sold before. I thought his mind as good as ever on business matters. He got off a little at one time talking about "red dust."
By Mr. Brown. — I never heard him spoken of as crazy. Have heard him spoken of as believing in witchcraft, or as superstitious.
Dr. William W. Stuart. — Was prisoner's physician from 1842 to 1849. On the day of killing his wife I had no other impression with regard to him, but that he knew and was conscious of the nature and consequences of what he had been doing.
By Mr. Bayard. — I knew nothing of the matters since spoken of.
By Mr. Houston. — I did not get there until after his wife's death.
By Mr. Cullen. — I saw him in jail last spring. Heard about the "hot stuff," c. When I was about to leave him he took my hand to bid me good by, and said he had always been my friend and considered me his friend, and said he would be glad I would make as *Page 537 
favorable an impression among the people in regard to his case as I could.
By Mr. Houston. — I think he said, before, that efforts had been made to prejudice his case.
By Mr. Bayard. — I have had but little practical knowledge of insane cases. I thought he had hypocondriasis; a disease frequently attended with delusions.
The case was argued before the jury by Mr. Cullen, and Saulsbury,Attorney General, for the prosecution, and by Messrs. Houston, Bayard
and Brown, for the prisoner.
Judge HARRINGTON charged the jury.
After remarking upon the case generally with reference to the jury's duty, he spoke of the arguments of counsel and of certain irrelevant matters which had been introduced. He specified the reference to the prisoner's wealth; to a supposed public opinion, whether for or against him; to the danger of having him turned out again upon society; to the responsibility of the jury here, or elsewhere, or any where, except to their own consciences, and to God, and said: — "Gentlemen, all these things are to be at once and forever thrown out of this case. If the prisoner have wealth, of which you have no proof before you, it may be properly used in employing counsel to defend him; but the wealth of Croesus could not swerve one of you from doing in the case what you conscientiously believe to be right. The public mind may be excited, and you have no evidence of that. To be sure it is excited, and always will be, and ought to be, when a great crime is supposed to be committed; but it is an excitement against the crime and against him who shall be found guilty of the crime; but where the question is one of sanity or insanity of the prisoner, there can be no excitement in the minds of a just and right minded community such as this is. If the prisoner did the act feloniously, having such capacity as made him a responsible being, (which is the very matter to be tried) such an excitement is a proper excitement, and he will justly suffer the extreme penalty of the law; but if you should find otherwise, and that, at the time he slew his wife he was an irresponsible being; no excitement could ever exist in favor of, or, if it did exist, could excuse or justify, the hanging a madman. And as to any danger in any event of this cause that may be supposed to arise from the prisoner, the same law which will punish him if he be guilty; the same law which will protect him if he be innocent; can afford abundant protection to society, in any, *Page 538 
supposable case, against him. I mention these things only to dismiss them."
He remarked generally upon the manner in which the case had been conducted, and said, "we have not witnessed any thing of persecution, or undue prosecution of the prisoner. The case has been prosecuted and defended with signal ability; and if the learned counsul have suffered themselves to get warm in argument, I am sure it is the only excitement that has been manifested or felt within these walls, except the curiosity that attracts this great crowd to hear the evidence, and to witness a display of forensic eloquence. For the rest, the deliberation which has protracted the case to a nine days' continuance; and the patience with which you have submitted to a practical imprisonment for the same term, manifest nothing of excitement or of haste to anticipate results which are not yet fully matured.
The prisoner is charged with the murder of his wife, and it may be assumed, for it is not denied, that he did kill her on the second of May, by shooting her with a pistol.
The homicide being proved, it is for the accused to extenuate or excuse his guilt, by proof of facts that will either reduce the grade of the crime to some other offence below murder, or will excuse it altogether, by showing that in the commission of the act he was not a voluntary agent or responsible being. The former of these has not been attempted; nothing of provocation or extenuation has been offered. The offence of the prisoner is murder, if it is anything at all; and we may as well at once simplify the issues, and bring the case to its true points, by so stating it.
All homicide is presumed to be murder, unless the contrary appear; voluntary and unprovoked homicide, by the use of a deadly weapon, can never be manslaughter of any degree, and must be murder, if the person slaying be a responsible being.
The defence therefore in this case is insanity; and the whole case turns upon the question whether John Windsor, at the time he killed his wife was sufficiently sane; had enough of judgment and will, and power over his own actions, to make him criminally responsible for that act.
The basis of accountability to God or man for any conduct is the power to distinguish between right and wrong, and to act accordingly. The sanction of all law rests on this assumption; the object of punishment can be served only on the same assumption. The law *Page 539 
prescribes that he who commits murder shall suffer death; not in vengeance for the deed, but as a just public example to restrain others; but no one can commit murder who has not criminal capacity, and no just public example can be made by the execution of an irresponsible being. At the same time, we are not to confuse the idea of a want of criminal capacity, with a mere defect of reason or judgment; we cannot measure the extent of a man's powers, nor could we regard any one as acting reasonably who slays another; the question is not how much reason and judgment a man has, but whether he had at the time the ability to distinguish between right and wrong in reference to the act itself, and the power to choose whether he would do it or not.
On the terms to be used by the court in putting such a case before a jury, eminent judges have differed in opinion, and the controversy on that subject has caused most of the legal dispute in this case. We will refer to some of them, and then give you our view of the law."
[The judge then referred to, and read, the cases of Rex vs. Hatfield, 1800, Shelf. Lun., 292; Rex vs. Bellingham, 1812; Rex vs. Offord, 1831, 24 Com. Law Rep., 259; Rex vs. Oxford, 1840, 38 Ibid, 220; Rex vs.Higginson, 1.843, 47 Ibid, 130; the resolutions of all the judges on the English bench on these questions in 1843; and the case of Abner Rodgers before the Supreme Court of Massachusetts, recently tried before Chief Justice Shaw.]
He then continued: —
"We do not perceive that there is any very great difference in all these cases; the aim of all seeming to be to define a state of mind inwhich the prisoner is capable of the perception or consciousness ofright and wrong, as applied to the act he is about to commit, and hasthe ability, through that consciousness, to choose, by an effort of thewill, whether he will do the deed which he knows to be wrong. Some of the definitions referred to have been assailed in the argument, and are said to have been questioned by others. Bellingham's case is one of them; and a remark is quoted of Lord Brougham, namely: "on that day week, (referring to the period of the murder,) Bellingham having been tried and convicted, was executed, to the eternal disgrace of the court which tried him, and refused an application for delay grounded on a representation that, were time given, evidence of his insanity could be obtained from Liverpool, where he *Page 540 
resided, and was known; "yet the doctrine of Sir James Mansfield in that case was recognized by Lord Lyndhurst in Offord's case so late as 1831; and the remark attributed to Lord Brougham was probably directed at the haste with which the trial was conducted; and not at the doctrines of the charge.
Upon the whole, we think that the terms used by Lord Denman in Oxford's case, express our view of the law about as well as any. In that case the Chief Justice of the Queen's Bench defined criminal capacity in these terms: —
"Persons prima facie, must be taken to be of sound mind till the contrary is shown. But a person may commit a criminal act and yet not be responsible. If some controlling disease was in truth the acting power within him, which he could not resist, then he will not he responsible. It is not more important than difficult to lay down the rule by which you are to be governed. Many cases have been referred to upon the subject. But it is a sort of matter in which you cannot expect any precedent to be found. It is the duty of the court to lay down the rule of the English law on the subject; and even that is difficult, because the court would not wish to lay down more than is necessary in the particular case.""On the part of the defence it is contended that the prisoner at the bar was not compos mentis; that is, (as has been said,) unable to distinguish right from wrong; or in other words that from the effect of a diseased mind, he did not know at the time that the act he did was wrong. As to the grandfather, two points will arise; whether his conduct was evidence of insanity, or only of violence of disposition; and if of insanity, whether the insanity was or was not hereditary? It may be that medical men may be more in the habit of observing cases of this kind than other persons; and there may be cases in which medical testimony may be essential; but I cannot agree with the notion that moral insanity can be better judged of by medical men than by others. As to the father of the prisoner, the question will be whether there was a real absence of the power of reason — the power of controlling himself; or whether it was only a violent, or even a cruel disposition; and then upon the whole, the question will be whether all that has been proved about the prisoner at the bar, shows that he was insane at the time when the act was done — whether the evidence given proves a disease in the mind, as of a person quite incapable of distinguishing right from wrong. Something has been said about the power to contract and to make a will. *Page 541 
But I think that those things do not supply any test. The question is, whether the prisoner was laboring under that species of insanity, which satisfies you that he was quite unaware of the nature, character and consequences of the act he was committing; or, in other words, whether he was under the influence of a diseased mind, and was really unconscious at the time he was committing the act, that it was a crime."
And in connection with the remark made by Lord Denman about the value of medical testimony on the question of moral insanity, the judge read from the charge of Chief Justice Shaw, of Massachusetts, the following remarks, to show the principle upon which such evidence is admitted.
"The opinions of professional men, on a question of this description, are competent evidence, and in many cases are entitled to great consideration and respect. The rule of law, on which this proof of the opinion of witnesses, who know nothing of the actual facts of the case, is founded, is not peculiar to medical testimony, but a general rule, applicable to all cases, when the question is one depending on skill and science, in any particular department. In general, it is the opinion of the jury which is to govern, and this is to be formed upon the proof of facts laid before them. But some questions lie beyond the scope of the observation and experience of men in general, but are quite within the observation and experience of those whose peculiar pursuits and professions have brought that class of facts frequently and habitually under their consideration. Shipmasters and seamen have peculiar means of acquiring knowledge and experience in whatever relates to seamanship and nautical skill. When, therefore, a question arises in a court of justice, upon that subject, and certain facts are proved by other witnesses, a shipmaster may be asked his opinion as to the character of such acts. The same is true in regard to any question `of science, because persons conversant with such science, have peculiar means, from a large experience in such department of science, of drawing correct inferences from certain facts, either observed by themselves, or testified to by other witnesses. A familiar instance of the application of this principle occurs very often in cases of homicide, when upon certain facts being testified to by other witnesses, medical persons are asked, whether, in their opinion, a particular wound described, would be an adequate cause, or whether such wound was, in their opinion, the actual cause of death, in the particular case. Such *Page 542 
questions are commonly asked without objection; and the judicial proof of the fact of killing often depends wholly or mainly on such testimony or opinion. It is upon this ground that the opinions of witnesses, who have long been conversant with insanity in its various forms, and who have had the care and superintendence of insane persons, are received as competent evidence, even though they have not had opportunity to examine the particular patient, and observe the symptoms and indications of disease, at the time of its supposed existence. It is designed to aid the judgment of the jury, in regard to the influence and effect of certain facts, which lie out of the observation and experience of persons in general. And such opinions, when they come from persons of great experience, and in whose correctness and sobriety of judgment just confidence can be had, are of great weight, and deserve the respectful consideration of a jury. But the opinion of a medical man of small experience, or of one who has crude and visionary notions, or who has some favorite theory to support, is entitled to very little consideration. The value of such testimony will depend mainly upon the experience, fidelity and impartiality of the witness who gives it.
One caution, in regard to this point, it is proper to add; even when the medical or other professional witnesses, have attended the whole trial, and heard the testimony of the other witnesses, as to the facts and circumstances of the case, they are not to judge of the credit of the witnesses, or of the truth of the facts thus testified by others. It is for the jury to decide whether such facts are satisfactorily proved."
The case was then committed to the jury, who retired; and the next day returned with a verdict of conviction.
Sentence of death was accordingly pronounced on the prisoner; but in consequence of great doubt of his sanity existing in the public mind, and especially with the medical profession, he has been respited from time to time by the Governor, and is yet (1856) in prison.
 *Page 1